AFFIDAVIT IN SUPORT OF CRIMINAL COMPLAINT

I, Lathan D. Sidebottom, being duly sworn, do hereby state:

1. Lathan D. Sidebottom is a Patrol Captain with the United States Department of
   Agriculture, Forest Service, Law Enforcement and Investigations. He has been so
   employed since June of 2012. Prior to this time period he was employed as a USDA
   Forest Service Law Enforcement Officer beginning in May of 2006. He has attended
   College of the Siskiyous, American River College and Santa Rosa Junior College. He is a
   graduate of the Federal Law Enforcement Training Center at Glynco, Georgia and the
   U.S. Forest Service Field Training and Evaluation Program, as well as the Drug
   Enforcement Training program. He has conducted numerous investigations in several
   states into suspected and alleged violations of federal and state law. Captain Sidebottom
   has drafted and executed multiple affidavits for search and arrest warrants, as well as
   formal charging documents. These investigations were centered on a wide range of
   subject matter, to include interference with Law Enforcement Officers, blocking of
   roadways and conspiracy to commit criminal offenses.

2. This affidavit is intended to show only that there is sufficient probable cause to support
   the listed charges and does not set forth all of my knowledge about this matter.

3. On August 5th, 2016 at approximately 0230 hours U.S. Forest Service Law Enforcement
   Patrol Captain Lathan Sidebottom received a call from U.S. Forest Service Dispatch
   reporting an unknown number of persons had barricaded themselves to the gate and
   blocked the route with forest debris on Tom Walker Road, (Forest Road 46N64.) This
   road is located on the Klamath National Forest, Oak Knoll Ranger District in Siskiyou
   County, CA, within the Eastern Judicial District of California. Tom Walker road
   intersects highway 96 on the Klamath River corridor east of Seiad Valley, CA. This
   National Forest System road is the designated primary haul route for multiple active
   timber harvest units located within the Westside Fire Recovery Project, a large fire
   salvage logging and landscape restoration effort administered by the U.S. Forest Service.
   Due to concerns over public safety in light of heavy truck traffic, marginal road
   conditions and inherent hazards associated with logging operations, an area closure and
   closure of roads within the project area was in effect under the authority of a Forest
   Order. This closure encompassed Tom Walker road, north to the property boundary with
   private parcels, approximately ½ mile north of the gate.

4. The Westside Project was met with strong opposition from environmental preservation
   groups throughout the planning process and subsequent implementation in 2016. In the
   months leading up to August, two additional protestor demonstrations had taken place on
   Tom Walker road, one of which blocked access to the timber sale areas until law

enforcement arrival prompted the participants to flee the location. Between March and August of 2016 multiple pieces of information suggestive of planning and invitations to disrupt logging activity appeared on social media. Mid-summer, an organization known as "Speak for the Trees" made multiple Facebook posts requesting specific supplies, food and other donated items for the apparent purpose of disrupting Westside project logging activities. Social media posts indicate a Jacksonville, Oregon man named Matthew MUSSELWHITE is deeply involved in this organization. The DMV address on file for MUSSELWHITE matches one of the two supply drop locations for the donation requests posted on-line.

5. Any activity which impacts Tom Walker road is an immediate problem for agency administrative access to the active timber sale areas. The route in question is traversed daily by the vast majority of logging personnel, mechanics, aviation support staff, log truck drivers, log truck loads, heavy equipment operators and myriad other industry support personnel engaged in the effort. As of August, 2016 two heavy lift helicopters were supporting approximately 40-80 loads of logs moved along the route on a daily basis. On the morning of August 5th, early reports indicated around 50 logging vehicles were backed up to highway 96, with an estimated 100 people unable to access the project areas. This traffic created additional impacts to adjacent private residences along Tom Walker road in the first half mile from highway 96.

6. The reporting party, a night shift water truck driver, was contacted by cell phone to ascertain further information about what was occurring at the location. This individual reported that he had driven through the gate around 0030 hours and observed no activity in the area. Approximately 1 hour later, another worker contacted him on the radio and reported multiple people were present at the gate, large branches and rocks had been placed in the roadway and an unknown number of parties were chained to the gate. He stated that only he and a night watchmen with one of the helicopter companies were present behind the gate, with the remaining large number of logging personnel blocked from the area and increasing in volume rapidly.

7. Due to the fairly large group sizes present at the last two demonstrations, it was necessary to ensure an adequately sized response for the safety of demonstrators and law enforcement personnel. On the morning of 08/05 USFS Law Enforcement on the Klamath National Forest was extremely drawn down on the availability of Officers for an immediate response due to multiple consecutive days of extended shifts focused on other pressing matters. Cpt. Sidebottom began the process of placing requests for assistance in responding to the event. Requests were placed to the Siskiyou County Sheriff's Office,

California Highway Patrol, CALFIRE and internally for USFS LEOs to respond from other parts of California, Oregon and Washington.

8. The response toward Tom Walker road from Yreka began around 0845. Units arrived at the intersection of highway 96 and Tom Walker road at approximately 0940 hours. Numerous logging personnel were parked at this location.

9. Shortly after the Officer's arrival, a red Subaru hatchback turned onto Walker Creek road. One of the loggers promptly informed Cpt. Sidebottom that the driver of the vehicle had been in and out of the area several times that morning and had been observed present at the gate, within the closure area. The vehicle was stopped by Officers present at the intersection. Captain Sidebottom made contact with the white male adult driver. He was identified as MATTHEW RAMSEY MUSSELWHITE by his Oregon driver's license. MUSSELWHITE was accompanied by a young juvenile female, around 5 years of age in the back seat.

10. Cpt. Sidebottom explained the reason for the stop and the presence of law enforcement at the location. MUSSELWHITE was asked what was occurring up the road at the gate. He relayed in summary that demonstrators were present to draw attention to the logging operations occurring in the area. He indicated 4 people were present at the location. MUSSELWHITE was asked what his part was in the event. He indicated he was present to conduct filming and denied providing any support to the participants. He was informed of the closure and the fact he had been present inside the closed area. JOEL CASWELL, one of the logging supervisors present at the location, showed Cpt. Sidebottom a cell phone photo of MUSSELWHITE'S vehicle near the gate, inside the closure area. Officer Shelton issued him a federal violation notice for being on a closed road in violation of Forest Order 16-05-778.

11. Law enforcement personnel departed the intersection of highway 96 and Tom Walker road, headed southbound toward the National Forest boundary and the scene of the demonstration at the gate. The paved portion of the roadway ends very close to the boundary of private property and National Forest System land. A short distance south of this location, a silver sedan was parked in a dirt pull out on the east side of Tom Walker road, along with a white male adult. Sgt. Weed and Officer Shelton made contact with this individual. He was identified as EVAN SWEENEY, by his California license. A field interview revealed indications he was present at the location to act as a lookout, providing advanced warning to the demonstrators at the gate regarding any observed law enforcement response. He was found in possession of a handheld radio, as were the people present up the road at the gate. SWEENEY was located within the closure area

and based upon the interview, was likely present to aid in the illegal blockage of the roadway. Based on the facts and circumstances, a federal violation notices were issued for blocking and restricting a road, as well as being within the closure.

12. Cpt. Sidebottom and the other initial responders arrived in the area of the gate, approximately just after 10 AM. A section of the roadway approximately 75-100 feet long was obstructed with large diameter tree limbs, sticks and rocks leading toward the gate. The debris hadn't been there earlier that morning. Two road closure signs, one of which had the Forest order stapled to the top, had been moved from their position at the gate and placed near the middle of the roadway amongst the debris, approximately 50 feet or greater south of the gate. Three people were present at the gate; two white male adults and one white female adult. The first white male was holding a GoPro camera and moving about the scene in an apparent effort to film law enforcement personnel. The female was standing near the gate, wearing a red and white medical cross safety pinned to her shirt. The second white male adult was seated on the ground at the pivot point for the National Forest System road gate.

13. The gate was closed with what appeared to be a new chain running through the locking bolt hole and out the lock housing. A padlock had been installed to secure the chain and prevent opening the gate. It appeared the Forest Service lock had been removed and discarded. Two large plastic barrels, approximately 55 gallons in volume were positioned on each side of the upright pivot point of the gate. The barrels were a shade of adobe red, covered with white painted writing expressing support for the Karuk Native American Tribe and displeasure in the logging operations. The barrels were filled with concrete, firm in consistency, but appearing damp as if poured in recent history. Large eye bolts were protruding from the top and sides of the barrels. The barrel positioned on the south side of the gate had been secured to the gate structure with additional chain and a separate lock. The barrels were extraordinarily heavy.

14. The man seated next to the pivot point on the gate had extended both forearms into PVC pipes that had been installed into the center of the barrels, parallel to the ground. His elbows were outside the barrels and his body was positioned so as to be seated equidistant between the devices. The gate was constructed of large diameter tubular steel. The top tube extended from the pivot point, across the roadway to another upright post where the chains and padlock had been affixed. A lower tube was connected to the bottom portion of the pivot point. This tube extended up to meet the main gate approximately half way across the road on an angle of about 45 degrees. The positioning of the top tube and lower support tube created a large triangle. His right arm extended

through this triangular void and into the barrel positioned on the south side of the gate. This arrangement created a situation where the gate could not be swung far enough open to allow traffic through, without contacting the barrels and thereby risking movement and injury to the seated individual.

15. The three participants were immediately contacted. They were each informed by Cpt. Sidebottom that they were in violation of multiple regulations. They were ordered to identify themselves, to which they indicated they would comply. The man seated at the base of the gate was later identified as MICHAEL A. BARTLEY of Somes Bar, CA by his California identification. The female was identified as TAMARA K. VOXNAES of Somes Bar, CA by a dispatch check of her personal information. The remaining male was identified as STANTON F. WOOD also of Somes Bar, CA by a dispatch check of his personal information. The group was questioned as to their purpose at the gate. They were all present, not handcuffed and able to move about as necessary.

16. WOOD indicated they were present in an effort to convince the government to implement the "Karuk Alternative," referencing a separate resource management plan advocated by the Karuk tribe. VOXNAES indicated she was present to support BARTLEY with necessary medical care, food and water. BARTLEY reaffirmed the statements made by WOOD. BARTLEY explained that his wrists were secured with chains and carabiners clipped into rebar inside the barrels. VOXNAES and he both indicated he could not be released from the devices. VOXNAES made some additional statements to the effect there was sharp debris present inside the barrels and movement of the objects would lead to injuries sustained by BARTLEY. This was later determined to be false.

17. BARTLEY was asked if there was anything law enforcement could do to convince him to come free of the barrels. BARTLEY indicated he would stay secured in the devices until the government agreed to implement the "Karuk Alternative." BARTLEY was ordered to let go of the devices and stand up. He refused, causing immediately delay in the Forest Officer's ability to resolve the situation and restore access to the area.

18. Entering upon the area within the Forest Order closure, or being upon any of the roads within the closure area constitute violations of Title 36 CFR, Sections 261.52(e) and 261.54(e), both of which are class B misdemeanor offenses. Blocking, or otherwise restricting a road, trail, or gate is prohibited under Title 36 CFR, Section 261. 12(d). Interfering with a Forest Officer is prohibited under Title 36 CFR, Section 261.3(a). These are misdemeanor federal offenses which were occurring in the immediate presence of Officers.

19. Based on the facts and circumstances contained herein, Cpt. Sidebottom informed BARTLEY he was under arrest. He continued to refuse the order to come to his feet and release from the devices. He was searched incident to arrest in the seated position. It was decided best to leave him in place and provide continued opportunity to comply with lawful orders to free himself from the barrels. BARTLEY did not comply.

20. VOXNAES and WOOD provided their personal information to Officers Wilson and Magallon so they could begin the process of drafting violation notices to be used as charging documents. WOOD was interviewed once more regarding his knowledge of the closure and purpose at the location. WOOD indicated he was aware the area was closed and that he was currently standing behind the closure sign in violation of the law. He indicated he had done so to ensure his friend had support.

21. VOXNAES was interviewed once more regarding her knowledge of the closure and purpose at the location. She indicated she was aware of the closure and that she wasn't supposed to be present at the location. When Cpt. Sidebottom stated that she had observed the signs in the roadway, she nodded her head yes.

22. VOXNAES and WOOD both indicated they were present to support the illegal blockage of the roadway as carried out by BARTLEY. Their participation in this matter facilitated a violation of Title 36 CFR, section 216. 12(d.) Based upon the facts and circumstances contained herein, they were both informed by Cpt. Sidebottom that they were under arrest. The pair were handcuffed and searched incident to arrest. They were transported to the United States District Court in Redding, CA by Officers Wilson and Haddox and brought before U.S. Magistrate Judge Craig M. Kellison.

23. At approximately 1130, with logging personnel having been delayed from work and denied access to the project sites for approximately 10 hours, the decision was made to cut the gate in order to restore vehicular access to the area. This decision came after law enforcement personnel had been present for nearly an hour and a half waiting for BARTLEY to comply with demands. Measurements were taken to ensure large vehicles could safely pass through the proposed opening. BARTLEY was covered with a metal and fiberglass laminate fire shelter in an abundance of caution to ensure an errant spark, or piece of hot metal could not come into contact with his skin, or clothing. Officer Shelton stood between the cutting operation and BARTLEY to ensure the shelter remained adequately secured. A gas cutting torch was utilized to sever the upper and lower gate tubes approximately three feet form BARTLEY'S seated position. The gate was removed from its position and laid on the shoulder of the road.

24. It was determined that traffic could safely be restored along Tom Walker road, provided certain steps were taken to ensure BARTLEY'S safety and comfort as he was seated along the edge of the lane. Arrangements were made for a water truck to wet the area in order to keep dust down and ensure limited irritation to his eyes and airway. Officers remained present at, or near his side to ensure the slow passage of traffic, and prevention of any debris striking BARTLEY as tires rolled past. Once these measures were in place, logging personnel were given clearance to enter the area. A long string of traffic moved past the severed gate and into the project sites.

25. BARTLEY remained in his seated position and continued his refusal to remove himself from the devices. The mid-day temperatures were beginning to significantly increase, casting intense sunlight on BARTLEY and law enforcement personnel present at the scene. Loads of logs began departing past BARTLEY back toward highway 96 over the next two hours. Officers repeatedly checked on BARTLEY'S welfare and provided access to his hydration bladder, within reach of his mouth. He remained seated, continuing to refuse orders to come free from the devices. Around 1315 hours the decision was made to slightly rotate the barrels backward in order to generate more space for the traffic lane. The barrels were rotated slightly outward, relative to the positioning of BARTLEY'S torso. This created a slight increase in tension on his arms and shoulders. These movements happened slowly and BARTLEY was afforded ample time to free himself from the devices if he so chose.

26. BARTLEY had been present at the location by his own admission since approximately 0130 hours. Temperatures and solar exposure were continuing to increase as the day wore on. BARTLEY had not consumed any food from the time law enforcement arrived at the scene. BARTLEY had continued to refuse commands to free himself from the devices. When asked if he was capable of freeing himself, he refused to answer. BARTLEY'S actions continued to consume scarce law enforcement resources in the region and impeded safe passage along the roadway. He had been asked countless times to release himself from the barrels and comply with law enforcement commands.

27. After continued lengthy delay, exposing BARTLEY to additional risk of heat and hydration related ailment, Officers seized an opportunity to withdraw his left arm from the barrel when the limb was observed moving about inside the device more than it previously had been. A minimal amount of force was applied to secure his left arm. Orders were given for BARTLEY to remove his right arm, to which he did not immediately comply. After adjusting his positioning, BARTLEY finally released his right arm and was taken into custody. At this point, it was discovered he had been secured by

short lengths of chain wrapped around his wrists, secured to rebar upright handholds
inside the barrel by small carabiners. Folding multi-tools were utilized to removed bolts
and nylon locking nuts which secured the chains to his wrists. These chains and the
associated hardware were seized as evidence.

28. BARTLEY was handcuffed. BARTLEY indicated he was uninjured and made no
requests for medical treatment. He was secured in the rear seat of a patrol vehicle. The
chains and eye bolts were seized as evidence, the barrels were photographed and pushed
into the ditch to remove the traffic hazard. (Heavy equipment returned to the site early the
following week to seize the barrels and secure them at a USFS facility.)

29. BARTLEY was transported to the United States District Court in Redding. BARTLEY
appeared before the Judge and was ordered to undergo the booking process at Shasta
County Jail, then be released to appear for further arraignment on September 13th, 2016.
As a condition of his release, he was ordered not to enter any National Forest lands, with
the exception of necessary travel upon state highways and county roads to access his
place of residence. WOOD and VOXNAES received the same orders and court date.
They were also ordered to complete the booking process. All three defendants were
released to the custody of Shasta County Jail.

30. Later inventories of property and evidence seized from the three individuals revealed the
presence of handheld radios, medical equipment, banners painted with the words "STOP
WEST SIDE" and non-perishable outdoor type food items with water. The presence of
these items, taken in the total context of the situation, are further evidence suggesting that
all three persons were present, acting in a coordinated fashion to obstruct the public
roadway. This event cost private business owners in the logging industry significant
monetary losses. The U.S. Forest Service expended significant salary costs on the
response to the road blockage, substantial damage to a gate and an injury suffered to an
employee during the later gate repair. An analysis of criminal history documents revealed
WOOD had a number of listed prior charges, including criminal conspiracy, interfering
with Officers, trespassing and vandalism.

///

///

///